**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES E. ENGSTROM and** | ) | |
| **RICHARD SHAW,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 23 C 15792** |
| | ) | |
| **AIR LINE PILOTS ASSOCIATION,** | ) | |
| **INTERNATIONAL and UNITED** | ) | |
| **AIRLINES, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

James Engstrom and Richard Shaw have filed suit against their employer, United Airlines, Inc., and their union, Air Line Pilots Association International (ALPA), for violations of the Florida Civil Rights Act (FCRA), the Americans with Disabilities Act (ADA), and Title VII of the Civil Rights Act of 1964 related to United's COVID-19 vaccination policies. United and ALPA have moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the following reasons, the Court grants the defendants' motions to dismiss.

**Background**

The Court summarizes the following allegations from the plaintiffs' second amended complaint (SAC). The plaintiffs are pilots employed by United. Engstrom lives in Orlando, Florida and flies out of his assigned "United Hub" in Newark, New Jersey. SAC ¶¶ 129–30. Shaw lives in Oviedo, Florida and flies out of his assigned

"United Hub" in Houston, Texas. *Id.* ¶¶ 161–62. Both plaintiffs are members of ALPA, which is a national labor union that serves as their certified collective bargaining representative.

## A.     United's COVID-19 vaccination policy

On August 6, 2021, United announced that all employees would be required to be vaccinated against COVID-19 unless they were granted a medical or religious accommodation. The deadline for accommodation requests was August 31, 2021; the deadline for submitting proof of vaccination was September 27, 2021. United terminated employees who did not submit proof of vaccination unless they had been granted a religious or medical accommodation. The plaintiffs allege that the only accommodation offered to employees who had been granted religious or medical exemptions was indefinite unpaid leave without benefits.

## B.     ALPA's response

The plaintiffs allege that, in response to United's announcement of the mandatory vaccination policy, ALPA took the position that the vaccination policy was a "job qualification" and therefore was a policy that United could adopt unilaterally without violating the terms of the operative collective bargaining agreement. [1] *See Id.* ¶¶ 106–07. As a result of its conclusion that the vaccination policy did not violate the collective bargaining agreement, ALPA refused to challenge the policy by, for example, suing to enjoin the mandatory vaccination requirement or pursuing a grievance. In addition to ALPA's alleged failure to take challenge the mandatory vaccination policy, the plaintiffs

---

[1] When United announced its mandatory vaccination policy in August 2021, United and ALPA "were in the process of negotiating a new contract under an expired collective bargaining agreement." SAC ¶ 82.

allege that the union actively discouraged its members from challenging the policy. For example, the plaintiffs allege that "ALPA distributed incorrect legal advice concerning the religious accommodation process, literally telling their members that in order to claim a proper religious accommodation they must be an adherent of a recognized religion with an established opposition to the vaccination process." *Id.* ¶ 109. In addition, the plaintiffs allege that ALPA "attempted to discourage its members from filing any grievances against the program" and "[w]hen grievances were filed by union members, [ALPA] limited the reach of those grievances so that United's COVID-19 vaccine policy would not be challenged." *Id.* ¶¶ 83–84. The plaintiffs allege that "ALPA ultimately decided to cut off processing of pilot grievances" despite having "received legal interpretations indicating that the original grievances were well-founded and appropriate to challenge United's COVID-19 vaccine policy." *Id.* ¶ 85. Further, "ALPA deliberately altered its role in the grievance process by attempting to have members 'self-file' their grievances because Defendant ALPA did not support the action" and "prohibited Defendant ALPA's staff from arguing on behalf of the aggrieved pilots." *Id.* ¶ 111.

Overall, the plaintiffs allege that "ALPA's actions created a chilling effect; thus, the Plaintiffs did not file grievances because doing so would be futile." *Id.* The plaintiffs further allege that ALPA's actions "effectively ended the ability of member pilots to challenge the COVID-19 vaccine mandate program through their collective bargaining agent and meant that Defendant ALPA would not challenge their terminations or seek to remedy them." *Id.* ¶ 128.

**C.    Plaintiffs' requests for accommodation**

Engstrom applied for both medical and religious accommodations.  His request for a religious accommodation was granted.  The offered accommodation, however, was "unpaid leave without benefits . . . for an indefinite period of time."  SAC ¶ 37. Engstrom's medical accommodation request was denied "in part" because he was "already approved for a religious accommodation."  *Id.* ¶ 139.  Because Engstrom "believed his request for reasonable accommodation from the COVID-19 vaccination due to his medical condition/disability was wrongly denied and violative of the [collective bargaining agreement between ALPA and United]," Engstrom requested assistance from his designated ALPA representative.  *Id.* ¶ 141.  The union representative advised him, however, that "ALPA could not provide assistance . . . because they deemed matters of COVID-19 vaccine exemption to solely be between the employee and United."  *Id.*

Shaw also applied for both medical and religious accommodations.  Both requests were granted.  Like Engstrom, United placed Shaw on indefinite unpaid leave. The complaint does not state whether Shaw sought to file a grievance or other assistance from ALPA.

The plaintiffs filed charges of discrimination with the Equal Employment Opportunity Commission and the Florida Commission on Human Relations.  They then filed this suit in the Middle District of Florida.  The defendants moved to transfer the suit for improper venue.  The district court granted the motion and transferred the case to this Court under 28 U.S.C. § 1406(a).

## Discussion

To survive a motion to dismiss for failure to state a claim, "the plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'" *NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 299 (7th Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). At the pleading stage, the Court must "accept all well-pleaded facts in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Id.*

### A. United Airlines

#### 1. Florida Civil Rights Act claims

The plaintiffs allege that United is liable under the Florida Civil Rights Act for disparate treatment on the basis of religion, failure to accommodate their religious practices, disparate treatment on the basis of handicap, failure to accommodate their handicap, and disparate impact on the basis of religious beliefs and handicaps. United argues that the plaintiffs cannot state a claim under the FCRA because that statute does not apply extraterritorially. United contends that the FCRA does not apply to the plaintiffs' claims because the plaintiffs fly out of United's hubs in New Jersey and Texas, United does not reside in Florida, and none of the employment decisions at issue occurred in Florida. The plaintiffs argue that because they are Florida residents, they are entitled to the protections of the FCRA "regardless of where they work or which state an employer resides." Pls.' Resp. to United's Mot. to Dismiss at 1–2.

"It is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). This

fundamental principle also applies to courts interpreting the territorial reach of state laws. *See, e.g.*, *Elzeftawy v. Pernix Grp., Inc.*, 477 F. Supp. 3d 734, 775 (N.D. Ill. 2020) ("As a general matter, 'the statutes of a state have no force beyond its boundaries.'" (quoting *Oman v. Delta Air Lines, Inc.*, 889 F.3d 1075, 1080 (9th Cir. 2018))). This default rule of statutory interpretation is commonly referred to as the presumption against extraterritorial application. In the employment context, this doctrine implies that the protections of an individual's home country or state are not presumed to follow that individual if they seek work across a state or federal border. *See, e.g.*, *Arabian Am. Oil Co.*, 499 U.S. at 259 (holding that Title VII protections did not cover U.S. citizens employed by U.S. companies in foreign countries).[2] To overcome the presumption against extraterritorial application, the statute must "clearly express[ ]" that it applies extraterritorially. *Id.* at 248; *see also RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) ("The question is not whether we think 'the legislature would have wanted' a statute to apply to foreign conduct 'if it had thought of the situation before the court,' but whether Congress has affirmatively and unmistakably instructed that the statute will do so."). Thus, unless the FCRA clearly states otherwise, its protections would not reach Engstrom's employment with United in New Jersey or Shaw's employment with United in Texas.

The plaintiffs have not disputed United's assertion that their employment is not based in Florida or that their claims implicate an extraterritorial application of the FCRA. Instead, they argue that they can assert claims under the FCRA because they are

---

[2] Congress later amended Title VII to include a clearly expressed affirmative extension of protections to United States citizens working abroad. *See* 42 U.S.C. § 2000e(f).

Florida residents.  As discussed, however, the fact that the plaintiffs reside in Florida is insufficient to show that the Florida legislature intended these protections to follow them when engaging in out-of-state employment activities.  The plaintiffs have not cited to any provision of the statute that unambiguously establishes that it applies extraterritorially.  "When a statute gives no clear indication of an extraterritorial application, it has none."  *RJR Nabisco*, 579 U.S. at 335 (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)).

The plaintiffs argue that a "Florida District Court and the Eleventh Circuit have each held that the FCRA is intended to protect Florida residents regardless of where they work or which state an employer reside."  Pl.'s Resp. to United's Mot. to Dismiss at 1–2 (citing *Mousa v. Lauda Air Luftfahrt, A.G.*, 258 F. Supp. 2d 1329, 1334 (S.D. Fla. 2003) and *Sinclair v. De Jay Corp.*, 170 F.3d 1045 (11th Cir. 1999)).  There are two problems with this argument.  First, decisions from the Eleventh Circuit are not binding on this Court, nor are decisions from district courts.  Second, the two cases to which the plaintiffs cite *do not* stand for the proposition that the FCRA applies to Florida residents regardless of where they work.  Both cases involved plaintiffs who worked *in Florida*; the courts therefore had no reason to (and did not) reach the question whether the statute applied extraterritorially.  Rather, those cases involved the unrelated question whether an employer who does not employ at least fifteen individuals within the state of Florida—but did employ at least fifteen individuals outside of Florida—met the FCRA's threshold requirement that an employer have fifteen employees to be subject to the Act's provisions.  *See Sinclair*, 170 F.3d at 1046; *Mousa*, 258 F. Supp. 2d at 1339.  The Court therefore does not find the plaintiffs' cited authority persuasive.  The Court

concludes that the FCRA's nondiscrimination provisions do not apply to the conduct at issue in this case and dismisses all FCRA claims against United (counts 1, 2, 3, 4, 5, and 6).

**B.    ALPA**

**1.    Disability discrimination claims under the FCRA and the ADA**

The plaintiffs assert that ALPA violated the FCRA and the federal ADA by discriminating against the basis of disability,[3] for failing to accommodate their disability, for disparately impacting members with disabilities, and for retaliating against them for engaging in protected activity.  Unlike United, ALPA has not argued that the plaintiffs' FCRA claims must be dismissed due to the presumption against extraterritorial application.  Rather, it argues only that the FCRA claims fail on the merits.  The parties agree that the standards for stating a claim for disability discrimination under the FCRA are the same as the standards under the ADA.  *See* ALPA's Mot. to Dismiss at 7; Pl.'s Resp. to United's Mot. to Dismiss at 3; Pl.'s Resp. to ALPA's Mot. to Dismiss at 3–8 (citing and relying exclusively on ADA caselaw).

To state a claim under the ADA, a plaintiff "must allege that he is disabled within the meaning of the Act, is nevertheless qualified to perform the essential functions of the job either with or without reasonable accommodation, and has suffered an adverse employment action because of his disability."  *Tate v. SCR Med. Transp.*, 809 F.3d 343, 345 (7th Cir. 2015).  ALPA argues that the plaintiffs' disability discrimination claims fail because they have not plausibly alleged that they have a "disability" as that term is

---

[3] The FCRA uses the term "handicap" rather than "disability."  The parties agree, however, that the terms may be used "interchangeably."  Pl.'s Resp. to United's Mot. to Dismiss at 3 n.3.

defined by the statutes. The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

The Court agrees that the plaintiffs have not plausibly alleged that they have a disability. First, the plaintiffs have failed to allege "a physical or mental impairment that substantially limits one or more major life activities" or "a record of such an impairment." *Id.* § 12021(1)(A) & (B).

With respect to Shaw, the complaint is devoid of any detail regarding his claimed substantially-limiting physical or mental impairment. Instead, it contains only vague references to a "medical condition." *See, e.g.*, SAC ¶ 165. The plaintiffs note in a footnote in their response to ALPA's motion to dismiss that Shaw alleged in his EEOC charge of discrimination, which was attached as an exhibit to the complaint, that he "[has] medical concerns which, pursuant to the advice of [his] healthcare provider, prevents [him] from receiving the COVID-19 vaccine without placing [his] career and life at risk." Pl.'s Resp. to ALPA's Mot. to Dismiss at 5.

These vague and conclusory references to "medical concerns" are insufficient to plausibly allege that Shaw has a "a physical or mental impairment that substantially limits one or more major life activities" or "a record of such an impairment." *Id.* § 12021(1)(A) & (B). Plaintiffs must "do more" than "merely parrot the statutory language of the claims that they are pleading (something that anyone could do, regardless of what may be prompting the lawsuit)"; they must "provid[e] some specific facts to ground those legal claims." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

"[A] court need not accept as true 'legal conclusions[, or t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009)).

With respect to Engstrom, the body of the complaint likewise only vaguely states that he was entitled to an ADA accommodation "due to his medical condition." SAC ¶ 133. The plaintiffs note in a footnote in their response to ALPA's motion to dismiss that "Engstrom alleges in his [EEOC] Charge [attached as an exhibit to the complaint] that he has a 'family medical history of thromboembolic disease," which "'[a]ccording to [his] healthcare provider, presents an increased risk of blood clot development as well as other cardiac complications if I were to receive the COVID-19 vaccine.'" Pl.'s Resp. to ALPA's Mot. to Dismiss at 5 n.3. But the plaintiffs do not explain or cite to any authority for the proposition that having a family history of a condition constitutes a disability under the ADA. Nor do they explain whether, let alone how, thromboembolic disease itself is "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12021(1)(A). The Court therefore concludes that both plaintiffs have failed to plausibly allege that they have a disability under the first two prongs of the statutory definition.

That leaves the plaintiffs' argument that they have "alleged that ALPA and United perceived them as disabled based on their lack of vaccination." Pl.'s Resp. at 5. As the plaintiffs acknowledge, however, this Court (and others) have dismissed employees' ADA claims that their employers regarded them as having a disability under section 12021(1)(C) based on their unvaccinated status. *See, e.g.*, *Hassett v. United Airlines, Inc.*, No. 23 C 14592, 2024 WL 1556300, at *2 (N.D. Ill. Apr. 10, 2024) (dismissing

plaintiff's claim that "[b]ecause of his non-vaccination status, United regarded [him] as being highly susceptible to COVID-19 and therefore at risk and thus discriminated against [him] based on a perceived disability"); *Ellis v. United Airlines, Inc.*, No. 23 C 123, 2023 WL 5722887, at *2 (N.D. Ill. Sept. 5, 2023) ("In short, the fact that United perceived Ellis as having a higher risk of contracting COVID-19 in the future due to his unvaccinated status does not allege a disability under the ADA."); *Jorgenson v. Conduent Transp. Sols., Inc.*, No. CV SAG-22-01648, 2023 WL 1472022, at *4 (D. Md. Feb. 2, 2023), *aff'd,* No. 23-1198, 2023 WL 4105705 (4th Cir. June 21, 2023) ("Conduent's decision to protect its workplace by requiring its employees to attest to their vaccination status—and in some cases, to wear masks—does not plausibly reflect a determination or belief that any of its employees are disabled or impaired."); *Hice v. Mazzella Lifting Techs., Inc.*, 589 F. Supp. 3d 539, 550 (E.D. Va. 2022) ("[P]ossible future exposure to COVID-19 does not constitute an impairment under the ADA."); *Gallo v. Washington Nationals Baseball Club, LLC*, No. 22-CV-01092 (APM), 2023 WL 2455678, at *4 (D.D.C. Mar. 10, 2023) (same).

The plaintiffs argue that their claims are distinct from the claims in, for example, *Hassett* and *Ellis* because they "have alleged that they have present medical conditions which necessitated them to seek exemption from the COVID vaccine." Pl.'s Resp. to ALPA's Mot. to Dismiss. As the Court has just explained, however, the plaintiffs have not identified any present and substantially limiting physical or mental impairment (aside from being unvaccinated, which is not sufficient) they had or were regarded by ALPA as having. In addition, as far as the Court can discern, the complaint does not even plausibly allege that ALPA had any awareness regarding the reasons for the plaintiffs'

11

unvaccinated status. The Court therefore concludes that the plaintiffs have not plausibly alleged that ALPA "regarded [the plaintiffs] as having" "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1).

Because a plaintiff must have a disability under the statutory definition to bring a discrimination and/or failure-to-accommodate claim, the Court need not reach ALPA's remaining arguments for dismissal of these claims. The Court dismisses the plaintiffs' claims for disparate treatment based on disability, failure to accommodate based on disability, and disparate impact based on disability under the ADA and the FCRA (counts 8, 9, 11, 13, 14, and 17).

### 2. Retaliation

The plaintiffs are not required to meet the definition of "qualified individual" in order to bring a claim for retaliation under the ADA. That is because "[e]mployers are forbidden from retaliating against employees who raise ADA claims regardless of whether the initial claims . . . are meritless." *Dickerson v. Bd. of Trs.*, 657 F.3d 595, 601 (7th Cir. 2011). To state a claim for retaliation under the ADA, "a plaintiff must show (1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) a causal connection between the two." *Id.*

ALPA argues that the plaintiffs fail to state an ADA retaliation claim because they have not pleaded a causal relationship between any protected activity and any adverse action taken by ALPA. ALPA suggests that the only protected activity that the plaintiffs engaged in was filing their EEOC charges, which occurred after ALPA's adoption of its position with respect to United's vaccination and reasonable accommodation policy. The

plaintiffs respond that they "took part in protected activity when they requested reasonable accommodations and exemptions to the COVID vaccine," "when they continued to oppose the actions of ALPA," and when they filed their EEOC charges of discrimination. Pl.'s Resp. to ALPA's Mot. to Dismiss at 10. They assert that ALPA then "took the position that it would not challenge United's COVID policy or the discriminatory and retaliatory unpaid leave" and "deliberately misstated the vaccine mandate as a job qualification versus a condition of employment." *Id.* at 10.

The Court concludes that the plaintiffs have not stated a claim for retaliation under the ADA. With respect to protected activity, it is least possible that plaintiffs' request for a reasonable accommodation for medical reasons qualifies as protected activity under the ADA, depending on the content of those requests. *See, e.g.*, *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814 (7th Cir. 2015) ("[The plaintiff] must have engaged in statutorily protected activity—in other words, he must have asserted his rights under the ADA by either seeking an accommodation or raising a claim of discrimination due to his disability."). As the Court has discussed, it is unclear what the plaintiffs communicated to ALPA (and to United) regarding the reason they were seeking a reasonable accommodation such that ALPA would have been aware that the plaintiffs were claiming to have a disability. But even assuming that the plaintiffs engaged in multiple forms of protected activity, they have not explained what adverse action ALPA took against them *in response to* their requests for accommodation, EEOC complaints, or unspecified "opposition" to ALPA.

With respect to Shaw, the complaint does not include any allegations that ALPA was even aware that he had submitted a reasonable accommodation request, much

less that he had done so on the basis of disability. With respect to Engstrom, he alleges only that he "sought assistance from his designated [ALPA] representative" regarding his accommodation request but was "advised that Defendant ALPA could not provide assistance . . . because they deemed matters of COVID-19 vaccine exemption to solely be between the employee and United." SAC ¶ 141.

Just as an employer's denial of a reasonable accommodation request is not sufficient to state a claim for retaliation, neither is the union's decision not to support a member's request for reasonable accommodation. *See, e.g., Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 243 (7th Cir. 2018); (A plaintiff "may not make an end-run around the 'qualified individual' requirement by simply reframing a discrimination or accommodation claim as one for retaliation."); *Hassett*, 2024 WL 1556300, at *5 ("A 'failure to accommodate' cannot serve as an adverse action for an ADA retaliation claim because it merely restates an underlying failure to accommodate claim." (quoting *Moore-Fotso v. Bd. of Educ. of the City of Chi.*, 211 F. Supp. 3d 1012, 1037 (N.D. Ill. 2016))). Otherwise, the union would violate Title VII's bar on retaliation any time it declined to support a disability-related grievance, which is plainly not the law. Moreover, the plaintiffs do not explain, and the Court is not persuaded, that a union's mere decision not to support an employee's grievance is sufficiently "adverse" to state a claim for retaliation. *Cf. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 54, 68 (2006) (holding that an adverse action to state a claim for retaliation under Title VII is an act that "a reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (internal quotation marks and citation omitted)).

Finally, nothing in the complaint plausibly suggests that there was any causal relation between the plaintiffs' protected activity and ALPA's decision-making regarding whether and how to oppose United's vaccine mandate. In other words, nothing suggests that the plaintiffs' decision to exercise their rights under the ADA influenced ALPA's actions. The Court thus concludes that the plaintiffs have not plausibly alleged that ALPA retaliated against them for engaging in protected activity under the ADA and the FCRA and grants ALPA's motion to dismiss these claims (counts 10 and 16).

### 3. Title VII

The plaintiffs also allege that ALPA discriminated against them on the basis of religion in violation of Title VII and the FCRA. The plaintiffs advance three theories of discrimination, which they refer to as "disparate treatment," "failure to accommodate," and "disparate impact." They also allege that ALPA illegally retaliated against them for engaging in protected activity. The parties agree that the same standards apply to determine whether the plaintiffs have stated claims for religious discrimination and retaliation under FCRA and under Title VII.

Title VII protects employees from religious discrimination not only by their employers, but also by "labor organization[s]" such as unions. 42 U.S.C. § 2000e-2(c). Under Title VII, it is unlawful for a labor organization:

> (1) exclude or expel from its membership, or otherwise to discriminate against, any individual because of his . . . religion . . . ;

> (2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's . . . religion . . . ; or

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

42 U.S.C. § 2000e-2(c). ALPA does not dispute that it qualifies as a labor organization.

The Seventh Circuit has made clear that a union is not vicariously liable for discrimination by a union member's employer. Rather, section 2000e-2(c) "concerns the union's role as the employees' agent (in bargaining and in implementing contracts)." *Maalik v. Int'l Union of Elevator Constructors Local 2*, 437 F.3d 650, 652 (7th Cir. 2006). "[I]f a union 'discriminates in the performance of its agency function, it violates Title VII, but not otherwise.'" *Id.* (quoting *EEOC v. Pipefitters Local Union 597*, 334 F.3d 656, 659 (7th Cir. 2003).

### 1. Disparate treatment (intentional discrimination)

The Court notes that the plaintiffs have asserted claims for both "disparate treatment" and "failure to accommodate." The Supreme Court has classified an employer's failure to accommodate as a type of disparate treatment claim. *See EEOC v. Abercrombie & Fitch Stores, Inc.,* 575 U.S. 768, 775 (2015). Nevertheless, because the plaintiffs have pleaded both "disparate treatment" and "failure to accommodate" claims, the Court understands that they are advancing two separate theories of discrimination. First, the plaintiffs allege that ALPA engaged in intentional discrimination, i.e. that ALPA adopted and/or enforced its response to United's vaccination policy "at least in part 'because of,' not merely 'in spite of,' its adverse effects on their religious practice." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *see* SAC ¶¶ 337–346. Second, the plaintiffs allege that ALPA failed to accommodate their religious beliefs in opposition to receiving the COVID-19 vaccine.

*See id.* ¶¶ 347–359.  The Court will therefore discuss whether the plaintiffs have stated a claim under either theory, beginning with the plaintiffs' intentional discrimination theory.

ALPA argues that the plaintiffs have not plausibly alleged that ALPA purposefully discriminated against Christians.  "To show discriminatory intent under Title VII, a plaintiff must demonstrate that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects on an identifiable group."  *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012) (alterations accepted) (quoting *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1273 (11th Cir. 2000)); 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that . . . religion . . . was a motivating factor for any employment practice, even though other factors also motivated the practice.").

The Court agrees that nothing in the complaint suggests that animus towards Christianity or religion was a "motivating factor" behind ALPA's actions.  42 U.S.C. § 2000e-2(m).  As the Court has discussed, the plaintiffs' central contention is that ALPA did not challenge United's mandatory vaccination policy or its reasonable accommodations policy for religious objectors to the COVID-19 vaccine, thereby permitting those policies to go into effect and harm the plaintiffs.  Certainly, selective inaction can be a form of discrimination in violation of Title VII.  *See Pipefitters Ass'n Local Union 597*, 334 F.3d at 661 (stating that it would be "a clear violation of . . . Title VII" "[i]f a black worker asks the union to grieve a complaint, the union refuses, though if the worker were white the union would grieve his complaint"); *Green v. Am. Fed'n of*

*Tchrs.*, 740 F.3d 1104, 1107 (7th Cir. 2014) ("If the union would have processed [the plaintiff's] grievance or represented him [in a lawsuit] had he been white . . . then the union violated Title VII.").  And, contrary to ALPA's assertions in its motion to dismiss, the plaintiff need not demonstrate that the union had an affirmative duty to act on the plaintiffs' behalf; it is sufficient to show that the union based its decision to act or to do nothing based on a protected characteristic such as an employee's race or religion. *See Green*, 740 F.3d at 1105 (stating that nothing in section 2000e–2(c) "makes anything turn on the existence of a statutory or contractual duty violated by the act said to be discriminatory").

That said, a plaintiff must plausibly allege that a union's inaction was in fact selective in a discriminatory fashion.  Nothing in the complaint suggests that ALPA's position regarding United's vaccination policies was motivated by animus against its members' Christian religious beliefs.  To the contrary, the allegations in the complaint point to alternative reasons underlying ALPA's position.  *See, e.g.*, SAC ¶ 89 ("Defendant ALPA . . .  supported United's receipt of federal funds and supported all COVID-19 initiatives undertaken by United in an effort to maintain this federal funding.").

In response, the plaintiffs assert that they have pleaded facts that plausibly support an inference that ALPA purposefully discriminated against them.  First, they argue that employees "without sincerely held religious beliefs were treated more favorably than Plaintiffs because they were not involuntarily placed on unpaid leave." *Id*.  But this is an argument regarding *United's* actions, not ALPA's.  As the Court has discussed, a union is not automatically liable for failing to stop an employer's discriminatory practices.

Second, the plaintiffs argue that ALPA actively worked to "boost[ ] vaccination numbers among its membership."  SAC ¶ 109.  As the Court has previously stated, "discrimination . . . based on vaccination status" is not "sufficient to allege discrimination based on religion."  *Anderson v. United Airlines, Inc.*, No. 23 C 989, 2023 WL 5721594, at *6 (N.D. Ill. Sept. 5, 2023).  The plaintiffs have not pleaded "any 'factual content to support an inference that [ALPA's alleged support for United's vaccine mandate] *itself* was adopted *because of* its adverse effects on' [the plaintiffs'] religious beliefs."  *Id.* (quoting *McReynolds*, 694 F.3d at 885).

Third, the plaintiffs argue that ALPA did not submit "LOA [Letter of Agreement] 21-02" for a vote among its members, allegedly in violation of the ALPA's own policies. *Id.* at 2.  The complaint does not explain the content or significance of LOA 21-02.  As best the Court can tell, it involved United's designation of certain airports/countries as "vaccine destinations," which the Court understands to be locations that required passengers and/or crew members to show proof of vaccination.  *See, e.g.*, SAC ¶ 99. Again, however, the plaintiffs do not connect the dots between ALPA's ratification of the Letter of Agreement and any discriminatory animus harbored by ALPA against Christians.  They do not claim, for example, that the Letter of Agreement "provided better treatment to unvaccinated pilots lacking religious or medical objections or that any pilot (vaccinated or not) could vote on it."  ALPA's Mot. to Dismiss at 5.

Fourth, the plaintiffs point to the fact that ALPA "distributed incorrect legal advice concerning the religious accommodation process, literally telling their members that in order to claim a proper religious accommodation, they must be an adherent of a recognized religion with an established opposition to the vaccination process."  *Id.* at 1–

19

2.  But misstating a legal standard in a highly complex area of the law, without more, does not plausibly suggest that ALPA intentionally set out to discriminate against Christians by giving them incorrect legal advice.

Finally, the plaintiffs cite to the fact that an ALPA leader told a member to "go get a fucking shot and collect $4K or he can STFU."  SAC ¶ 101.  But the plaintiffs allege that this comment was made in response to a member's "objection to the emergency use authorization status of the vaccine," not in response to any expression of religious beliefs or objections.  *Id.*

In sum, the plaintiffs' allegations, taken as true, do not plausibly suggest that ALPA acted with discriminatory animus towards Engstrom and Shaw based on their religious beliefs.  The Court therefore dismisses the plaintiffs' Title VII and FCRA "disparate treatment" claims (counts 12 and 7)[4].

### 2.     Failure to accommodate

The plaintiffs also allege that ALPA has violated Title VII and the FCRA under a "failure-to-accommodate" theory of disparate treatment.  Title VII defines the term "religion" to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).  To make out a prima facie case of a Title VII failure-to-accommodate claim, a plaintiff must

---

[4] The SAC labels two different counts as "count 7":  the plaintiffs' FCRA claim for disparate treatment based on religion against ALPA and their FCRA claim for failure to accommodate based on religion against ALPA.  *See* SAC ¶¶ 276, 288.  To minimize confusion, the Court will refer to each count as it is numbered in the SAC.

plausibly allege that "(1) the observance, practice, or belief conflicting with an employment requirement is religious in nature; (2) the employee called the religious observance, practice, or belief to the employer's attention; and (3) the religious observance, practice, or belief was the basis for the employee's discriminatory treatment." *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1009 (7th Cir. 2024). "At that point the employer can invoke the affirmative defense that accommodation would result in 'undue hardship' or a 'substantial' burden in the 'overall context' of the business." *Id.* (quoting *Groff v. DeJoy*, 600 U.S. 447, 468 (2023)).

The plaintiffs do not allege, however, that they ever requested any religious accommodation *from ALPA*. As the Court has previously explained, ALPA is not vicariously liable for United's alleged failure to accommodate. In response to ALPA's motion to dismiss the plaintiffs' failure-to-accommodate claims, the plaintiffs merely repeat their allegations that ALPA intentionally discriminated against them by "failing to oppose United's policies in any fashion," "discouraging members from filing grievances," and so forth. The Court has already discussed, however, why these allegations are insufficient to state a claim for discrimination based on religion. The Court therefore concludes that the plaintiffs have not stated a claim that ALPA failed to accommodate their religious beliefs in violation of Title VII and the FCRA (counts 7 and 12).

### 3.    Disparate impact

Next, the plaintiffs allege that ALPA's policies resulted in a disparate impact on a protected group in violation of the FCRA and Title VII. "Title VII prohibits employment practices that have a disproportionately adverse impact on employees with protected characteristics, even if the impact is unintended." *Ernst v. City of Chicago*, 837 F.3d

788, 794 (7th Cir. 2016). To establish a prima facie case of disparate impact, "plaintiffs must produce evidence that an employment practice results in observed statistical disparities, as well as establish causation with statistical evidence of a kind and degree sufficient to show that the practice in question has caused the [alleged disparity] because of their membership in a protected group." *Chi. Tchrs. Union v. Bd. of Ed.*, 14 F.4th 650, 655 (7th Cir. 2021) (internal quotation marks and citations omitted).

ALPA argues that the plaintiffs have neither identified a specific employment policy/practice nor provided any evidence of the policy/practice's disparate impact on a protected group. The plaintiffs respond that the policies they contest are "United's COVID vaccine policy, and ALPA's initial acquiescence and later affirmative action supporting such," and that detailed statistical evidence is not required at the pleading stage. Pl.'s Resp. to ALPA's Mot. to Dismiss at 8.

The Court agrees with ALPA that the plaintiffs' allegations are too vague and scattered to plausibly state a claim for disparate impact under Title VII. The Seventh Circuit has emphasized that a plaintiff cannot base a disparate impact claim on the mere observation of a disparity among an employer's employees. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012) ("Notably, 'it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact.'" (quoting *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005)). Instead, a plaintiff must "identify a specific employment practice, allege its causation of the disparate impact, and give Defendants fair notice of the claim." *McQueen v. City of Chicago*, 803 F. Supp. 2d 892, 907 (N.D. Ill. 2011). Thus, a plaintiff cannot, for example, state a claim for disparate impact merely by alleging that a defendant's female

22

employees earn less than its male employees. *See, e.g.*, *Zigler v. Edward D. Jones & Co., L.P.*, 676 F. Supp. 3d 615, 622 (N.D. Ill. 2023) (concluding that a plaintiff's allegation that the "defendant applied its 'compensation program' in a manner that 'disadvantages female home office employees'" was insufficient to state a claim for disparate impact because it failed to identify specific policies responsible for the disparity).

Faced with ALPA's argument that the plaintiffs do not identify any specific policy or practice causing a disparate impact, the plaintiffs do not provide any clarity. Rather, their response brief focuses largely on *United's* COVID-19 vaccination policy and reasonable accommodation policy. As the Court has emphasized, however, the plaintiffs are required to specify the *ALPA* policy (or policies) upon which their disparate-impact claim is based. In addition, the plaintiffs must coherently articulate *how* those specific policies disadvantaged a protected class. *See Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014) (dismissing a Title VII disparate-impact claim because "[f]or all its heft, the amended complaint alludes to disparate impact in wholly conclusory terms").

The Court agrees with the plaintiffs, however, that they are not required to provide detailed statistical analysis at the pleading stage. The Seventh Circuit has explained that "[d]isparate-impact plaintiffs are permitted to rely on a variety of statistical methods and comparisons to support their claims. At the pleading stage, some basic allegations of this sort will suffice." *Id.* Thus, although the plaintiffs must allege some sort of disparity among protected versus unprotected classes, they are only required to allege sufficient "factual material to move the disparate-impact claim over the plausibility

threshold." *Id.* That being said, the Court notes that there is some vagueness in the complaint and the plaintiffs' response regarding whether they allege that the policies negatively impacted Christians over non-Christians, "religious" members over non-religious members, or some other theory of disparate impact. Moreover, the plaintiffs at times group together religious objectors and disabled ALPA members. But the plaintiffs cannot bring a disparate impact claim under the ADA for the reasons the Court has discussed above. *See Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1062 (7th Cir. 2000) (stating that an employee must be a qualified individual with a disability to bring a disparate impact claim under the ADA). The lack of clarity regarding the groups that the plaintiffs allege are disadvantaged compounds the issues the Court has described above with the plaintiffs' failure to coherently connect the dots between a specific practice that causes a specific disparate effect on a specific protected class. In sum, the Court concludes that the plaintiffs have not "move[d] the disparate-impact claims over the plausibility threshold" and dismisses the disparate-impact claims (counts 11 and 15). *Adams*, 742 F.3d at 733.

### 4. Retaliation

Finally, the plaintiffs allege that ALPA retaliated against them in violation of Title VII and the FCRA. Like retaliation under the ADA, retaliation under Title VII requires a plaintiff to plausibly allege: "(1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action.*" Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (quoting *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018)). The plaintiffs rely on the same factual allegations for their ADA retaliation and Title VII

retaliation claims, and therefore they fail to state a claim for the same reasons. Namely, the plaintiffs have not plausibly alleged a causal connection between their protected activity (requesting a religious accommodation, filing charges of discrimination, and engaging in unspecified "opposition" to ALPA) and any adverse action against them taken by ALPA. Because a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer," the plaintiffs have not stated a claim for retaliation under Title VII or the FCRA (counts 10 and 14). *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

## C.    Common law claims against both defendants

The plaintiffs also bring claims for intentional infliction of emotional distress and civil conspiracy. To start, the parties disagree regarding which states' law governs the claims at issue. The Court need not resolve the choice-of-law issue, however, because the plaintiffs have not stated a claim under either Florida or Illinois law.

### 1.    Intentional infliction of emotional distress

The plaintiffs allege that United and ALPA are liable for intentional infliction of emotional distress (IIED). Under either state's law, however, the defendant must *intend* to inflict emotional distress. To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show "(1) intentional or reckless conduct (2) that is outrageous in that it is beyond all bounds of decency and utterly intolerable in a civilized community (3) and that causes the victim emotional distress (4) that is severe." *Cala v. Moorings Park Cmty. Health, Inc.*, No. 22 C 635, 2022 WL 17405581, at *5 (M.D. Fla. Dec. 2, 2022), *reconsideration granted on other grounds*, 2023 WL 1102646 (M.D. Fla. Jan. 30, 2023) (internal quotation marks and citation omitted); *accord Feltmeier v. Feltmeier*, 207

Ill. 2d 263, 269, 798 N.E.2d 75, 80 (2003) ("First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress.").

The Court agrees with several courts that have held that an employer's enforcement of a COVID-19 vaccination requirement, even over a religious or medical objection, is insufficient to give rise to a claim for intentional infliction of emotional distress. *See, e.g.*, *Platta v. Gray Media Grp., Inc.*, No. 23 C 236, 2023 WL 11807236, at *7 (N.D. Ga. May 12, 2023), *report and recommendation adopted*, 2023 WL 11807225 (N.D. Ga. Nov. 17, 2023) ("As far as the Court can tell, every federal court that has addressed the viability of an IIED claim premised upon an employee's refusal to comply with his employer's COVID-19 vaccine policy has dismissed the claim because the underlying conduct is not sufficiently extreme or outrageous, and this is true even when the employee alleges that the policy impinges on his religious beliefs."); *Schmidt v. City of Pasadena*, No. LA CV 21 08769, 2024 WL 1640913, at *22 (C.D. Cal. Mar. 21, 2024); *Johnson v. United Parcel Serv., Inc.*, No. 23 C 545, 2023 WL 11796098, at *11 (N.D. Ga. Oct. 31, 2023), *report and recommendation adopted*, 2023 WL 11796096 (N.D. Ga. Dec. 19, 2023); *Cala*, 2022 WL 17405581, at *5; *Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d 458, 469 (M.D. Pa. 2022). First, nothing in the plaintiffs' complaint plausibly suggests that United chose to require its staff to receive COVID-19 vaccinations in the midst of the pandemic for the purpose of causing, or with the belief that they were inflicting, severe emotional distress on their employees. Nor

does the complaint plausibly suggest that ALPA decided not to challenge that policy for that reason.

Second, the plaintiffs have not plausibly alleged that the defendants' conduct was "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Johnson*, 2023 WL 11796089, at *11 (quoting *Racette v. Bank of Am.*, 318 Ga. App. 171, 179, 733 S.E.2d 457, 465 (2012)). Many employers, schools, and other entities have instituted vaccination requirements both for COVID-19 and other infectious diseases, and there is ongoing reasonable debate regarding the extent to which employers should or must grant exceptions to such requirements. *See Schmidt*, 2024 WL 1640913, at *22 ([This] lawsuit was brought, [sic] in the wake of vaccine mandates that engulfed the workplace in almost all industries between 2020 and 2021. Actions so commonplace do not constitute conduct so extreme and outrageous as to exceed the bounds of civilized society."). Indeed, antidiscrimination statutes permit employers to decline religious and/or medical exemptions if the employer demonstrates sufficient business necessity. Although the plaintiffs may dispute whether such necessity was present in this case, nothing in the complaint suggests that United's vaccination requirements and/or ALPA's failure to support that policy was so divorced from all possible justification that they amounted to an outrageous assault on the dignity of objecting employees. "[G]iven that [the defendants] acted within the context of a broad safety measure implemented in response to a burgeoning health crisis," the complaint does not plausibly suggest that "the company [and union] acted 'beyond all possible bounds of decency.'" *Johnson*, 2023 WL 11796098, at *12. The Court thus concludes that the plaintiffs have failed to

state a claim for intentional infliction of emotional distress (count 18).

### 2. Civil conspiracy

Finally, the plaintiffs allege that the defendants are liable for civil conspiracy. The plaintiffs do not dispute the defendants' assertion that, to state a claim for civil conspiracy, they must state a claim for an underlying unlawful act. As the Court has discussed, however, the plaintiffs have not plausibly alleged that either United or ALPA violated the law. The plaintiffs therefore have not stated a claim for civil conspiracy (count 19).

### 3. Preemption

Lastly, the Court notes that both ALPA and United raise various preemption arguments related to the plaintiffs' state-law clams. Because the Court has concluded that the plaintiffs' state-law claims are insufficient for different reasons, it need not address the parties' arguments on preemption.

### Conclusion

For the reasons stated above, the Court grants United and ALPA's motions to dismiss for failure to state a claim [dkt. nos. 74 & 75]. Unless the plaintiff files, by August 26, 2024, a motion for leave to amend that attaches a proposed amended complaint stating at least one viable claim over which the Court has jurisdiction, the Court will enter judgment in favor of the defendants. The case is set for a telephonic status hearing on September 5, 2024, at 9:10 a.m., using call-in number 650-479-3207, access code 980-394-33.

Date: August 16, 2024

MATTHEW F. KENNELLY
United States District Judge